IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NANCY MCCORMACK, | : | CIVIL ACTION |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DENTSPLY SIRONA, INC., et al., | : | |
| *Defendants*. | : | NO. 26-CV-2154 |

MEMORANDUM

**KENNEY, J.**                                                                    **June 24, 2026**

Plaintiff Nancy McCormack brings this suit against Defendants Dentsply Sirona, Inc., Straight Smile, LLC t/a and/or d/b/a Byte, Dentsply Sirona Orthodontics, Inc., Byte Dental Practice, PLLC, John Doe Corporations 1–5, and John Does 1–5, asserting claims for personal injury related to Plaintiff's use of Defendants' dental aligners. ECF No. 2-2 ("Compl."). Before the Court is Defendants Dentsply Sirona, Inc., Straight Smile, LLC t/a and/or d/b/a Byte, Dentsply Sirona Orthodontics, Inc., and Byte Dental Practice, PLLC's (collectively, "Defendants") Motion Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–16, to Stay Action and Compel Arbitration. ECF No. 13 (the "Motion"). Defendants move this Court to stay the above-captioned action and compel Plaintiff to arbitrate her claims subject to a valid and enforceable arbitration agreement. *Id.* at 1. For the reasons set forth below, the Court will grant Defendants' Motion to Compel.

## I.    BACKGROUND

From 2024 to 2025, Plaintiff placed three online orders with Defendant Straight Smile, LLC d/b/a Byte ("Byte"), an orthodontics company. ECF No. 13-1 at 9, 14. The three orders were placed for the following items on the following dates: an impression kit on August 19, 2024, the

"byte system" dental aligners on September 6, 2024, and continuation aligners on April 17, 2025. *Id.* at 14; ECF No. 13-2 at 19. Plaintiff alleges that her "dental aligners were in a defective condition and were unreasonably dangerous," which caused her to suffer "severe and disabling injuries." Compl. ¶¶ 15, 17. The Complaint is silent as to the existence of an arbitration agreement. *See id.*

Byte's products may only be purchased via their website, and, during the purchase process, Plaintiff checked a box agreeing to Byte's Informed Consent, which contained an Agreement to Arbitrate and Class Action Waiver (the "Arbitration Agreement"). ECF No. 13-1 at 10–14. The box checked by Plaintiff stated, "I agree to Byte's Privacy Policy, Terms of Use, and Informed Consent." *Id.* at 10. The three policies—"Privacy Policy," "Terms of Use," and "Informed Consent"—were "presented to users as a hyperlink that, when clicked, take the user to another screen that displays the full text of each." *Id.* at 11. The site does not require the purchaser to either click on the hyperlinks or otherwise read the documents contained therein prior to making a purchase. ECF No. 17-1 at 2. However, purchasers cannot complete their purchase(s) without checking the box next to the statement, "I agree to Byte's Privacy Policy, Terms of Use, and Informed Consent." ECF No. 13-1 at 10.

The Informed Consent, titled "Customer Consent" upon clicking on the hyperlink, contains the Arbitration Agreement, which starts on the bottom of page eight of the thirteen-page document with the following heading in bold, "**Agreement to Arbitrate and Class Action Waiver**." ECF No. 13-2 at 5, 12. The Arbitration Agreement states, in relevant part:

> I hereby attest that I have read and agree with, and have taken time to consider the consequences of this important decision, the terms of Byte's **Agreement to Arbitrate and Class Action Waiver** that is attached hereto. I agree that any dispute regarding the products and services offered by Byte and/or affiliated dental professionals, including but not limited to medical malpractice disputes, will be determined on an individual basis (and not as a class, representative, or collective

action) by submission to arbitration pursuant to the attached Agreement to Arbitrate and Class Action Waiver, and not by a lawsuit led in any court, except individual claims within the jurisdiction of Small Claims Court. . . . I agree that the arbitration shall be conducted by a single, neutral arbitrator selected by the parties and shall be resolved using the rules of the American Arbitration Association.

*Id.* at 12–13.

The Arbitration Agreement appears again on page ten of the Informed Consent document and continues through the last line of page twelve of the document. *Id.* at 14–16. On page ten, about one-quarter of the way down the page, again with the title, "**AGREEMENT TO ARBITRATE AND CLASS ACTION WAIVER**," this time in all capital letters, bold, and large font, the Arbitration Agreement states, in relevant part:

You and Byte et al. agree that any dispute, claim or controversy arising of or relating to (a) the Customer Consent or the existence, breach, termination, enforcement, interpretation or validity thereof, or (b) your access to or use of the services and products you order and/or receive from Byte et al. . . . will be settled by binding arbitration between you and Byte et al., and not in a court of law.

You acknowledge and agree that you and Byte et al. are each waiving the right to a trial by jury or to participate as a plaintiff or class member in any purported class action or representative proceeding.

*Id.* at 14. The Arbitration Agreement was registered with the Arbitration Association's Consumer Clause Registry, meaning it was reviewed by the American Arbitration Association ("AAA") and "substantially and materially complies with the due process standards of the Consumer Due Process Protocol." ECF No. 13-1 at 14 (citation omitted).

Plaintiff admits that the Parties entered into the Arbitration Agreement but claims that she "never even read the agreement to arbitrate let alone agree[d] to it" because the site did not require her to review or sign the agreement prior to completing her purchases. ECF No. 17-1 at 2–3, 5.

On February 27, 2026, Plaintiff instituted the instant action in the Court of Common Pleas of Philadelphia County, Pennsylvania. ECF No. 2 at 1–2. On April 1, 2026, Defendants removed

the action to this Court. *Id*. at 1. On April 14, 2026, Defendants filed the instant Motion to Compel, ECF No. 13, to which Plaintiff responded on May 6, 2026, ECF No. 17. Defendants filed a Reply on May 14, 2026. ECF No. 18. Accordingly, the Motion is fully briefed and ripe for adjudication.

## II.    LEGAL STANDARD

When "the affirmative defense of arbitrability of claims is apparent on the face of a complaint," the standard of review that a court applies to a motion to compel arbitration is the motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6). *Guidotti v. Legal Helpers Debt Resol., LLC*, 716 F.3d 764, 773 (3d Cir. 2013) (quoting *Somerset Consulting, LLC v. United Cap. Lenders, LLC*, 832 F. Supp. 2d 474, 481 (E.D. Pa. 2011)). However, as relevant here, when the complaint is silent as to an agreement to arbitrate, the summary judgment standard under Federal Rule of Civil Procedure 56 applies. *Id.* at 776; *see also Young v. Experian Info. Sols., Inc.*, 119 F.4th 314, 319 (3d Cir. 2024) (holding that the Rule 56 summary judgment standard is appropriate where plaintiff's complaint did not reference an arbitration agreement).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only when a reasonable jury could return a verdict on the issue for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, the court must view any inferences drawn from the underlying facts "in the light most favorable to" the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). To defeat a motion to compel arbitration on a summary judgment standard, the non-moving party must "demonstrate, by means of citations to the record, that there is a genuine dispute as to the enforceability of the arbitration clause" to "proceed summarily to a trial regarding the making of the arbitration agreement or the failure,

neglect, or refusal to perform the same." *Guidotti*, 716 F.3d at 776 (quoting *Somerset Consulting, LLC,* 832 F. Supp. 2d at 482 (internal quotations omitted)).

Discovery on the issue of arbitrability is not necessary when the record on a motion to compel arbitration is sufficient for the district court to make a determination as to whether a meeting of the minds occurred on the agreement to arbitrate. *Young*, 119 F.4th at 320 ("[D]iscovery addressing a motion to compel arbitration is unnecessary when no factual dispute exists as to the existence or scope of the arbitration agreement.").

III.    **DISCUSSION**

Here, because the Complaint does not reference the Arbitration Agreement and Plaintiff does not dispute either the existence of the agreement or her acknowledgement of the agreement (but asserts a defense to its enforceability as a matter of law), *see* ECF No. 17-1 at 2–3, the Court will apply the summary judgment standard to Defendants' Motion to Compel Arbitration. Additionally, because there are no material facts in dispute, further discovery is unnecessary.

Defendants move to stay this matter and compel arbitration pursuant to the Arbitration Agreement to which Plaintiff indicated her agreement via a checkbox when making purchases on Byte's website. ECF No. 13-1 at 9, 14. The Court finds that the Arbitration Agreement is enforceable because Plaintiff affirmatively agreed to the Informed Consent containing the Arbitration Agreement, regardless of whether Plaintiff actually read the agreement. The Court also finds that the Arbitration Agreement is sufficiently broad enough to cover Plaintiff's claims. For the reasons discussed below, the Court will grant the Motion and compel arbitration in this case.

**A.  The Arbitration Agreement is a Valid, Enforceable Contract**

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, requires courts to stay proceedings and uphold written arbitration agreements that are "valid, irrevocable, and enforceable," 9 U.S.C. §§ 2–3. By enacting the FAA, Congress intended for courts to administer

the agreement of parties to arbitrate as a matter of contract. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985). "Because arbitration is a matter of contract, before compelling arbitration pursuant to the Federal Arbitration Act, a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (citation omitted). The Court will first turn to the question of whether there existed a valid arbitration agreement in this case.

Under Pennsylvania law,[1] an online arbitration agreement must satisfy the following traditional contract principles to be enforceable: (1) mutual manifestation of intent to be bound by the agreement; (2) sufficiently definite terms to be enforced; and (3) valid consideration. *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002) (applying Pennsylvania law); *Checchia v. SoLo Funds, Inc.*, 771 F. Supp. 3d 594, 606 (E.D. Pa. 2025) (applying Pennsylvania and California law interchangeably). The issue before the Court is whether Plaintiff intended to be bound by the Arbitration Agreement. Defendants assert that Plaintiff's action of checking the box indicating her agreement to the Informed Consent is enough to be bound by the Arbitration Agreement. ECF No. 13-1 at 23–24. Plaintiff argues that the Arbitration Agreement is unenforceable because she was not informed that she was waiving her constitutional right to a jury trial in an upfront manner and, thus, she did not agree to it. ECF No. 17-1 at 4–5. Plaintiff does not argue that the terms of the Arbitration Agreement are not definite or that there was no valid consideration. *See id.*

Here, in the context of an online consumer purchase, intent to be bound turns on whether Plaintiff received reasonable notice of the Arbitration Agreement. *Dobbs v. Health IQ Ins. Servs., Inc.*, No. 21-cv-5276, 2022 WL 2974713, at *3 (E.D. Pa. July 27, 2022). Although Plaintiff did

---

[1] The Parties do not dispute that the issue of arbitrability in this case is governed by Pennsylvania law. *See* ECF No. 13-1 at 21; ECF No. 17-1 at 3.

not read the Arbitration Agreement and thus did not have actual knowledge of the agreement, ECF No. 17-1 at 2–3, the Court nonetheless finds that Plaintiff had adequate inquiry notice of the agreement because (1) Plaintiff had reasonably conspicuous notice from Byte's purchase page of the Informed Consent document containing the Arbitration Agreement, and (2) Plaintiff unambiguously manifested her assent to the terms of the agreement by affirmatively clicking the corresponding checkbox indicating her agreement.

### 1.   *Plaintiff had reasonably conspicuous notice of the Arbitration Agreement*

Although Plaintiff disputes that she had notice of the Arbitration Agreement, ECF No. 17-1 at 4, Byte's Informed Consent was conspicuous to a reasonable user because the hyperlink to the Informed Consent was presented in a clear manner—in blue, underlined font—within the statement, "I agree to Byte's Privacy Policy, Terms of Use, and Informed Consent," *see* ECF No. 13-1 at 10. In addition, the Arbitration Agreement itself, within the Informed Consent document, explained in detail that Plaintiff was waiving her right to a jury trial. *See* ECF 13-2 at 14; *see Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856–57 (9th Cir. 2022) (analyzing conspicuous notice from the perspective of "a reasonably prudent Internet user").

Courts often utilize labels such as "clickwrap" and "browsewrap" to determine whether an online contract provides adequate notice to an internet user to bind him/her to its terms. *See Duffy v. Tatum*, 354 A.3d 14, 23–24 (Pa. Super. Ct. 2026). "Clickwrap" agreements arise where a website presents the consumer with terms and conditions, often via hyperlink, and the consumer must click a box stating "I agree" before continuing onto the site. *Id.* at 24. These agreements are commonly enforced because the user must take some action indicating his/her assent to the terms. *See Dobbs*, 2022 WL 2974713, at *4 (enforcing a clickwrap agreement because plaintiff received notice of the hyperlinked terms at the end of a fillable form and manifested assent by clicking the "SUBMIT"

button); *Coulter v. Experian Info. Sols., Inc.*, No. 20-cv-1814, 2021 WL 735726, at \*5 (E.D. Pa. Feb. 25, 2021) (enforcing a clickwrap agreement to arbitrate because the terms were "readily available" via hyperlink and the website advised users that by clicking the "Submit Secure Order" button, they were accepting and agreeing to the terms of use). Generally, consumers who do not read the terms of a clickwrap agreement are still bound by the terms if they received inquiry notice and indicated assent. *Dicent v. Kaplan Univ.*, 758 F. App'x 311, 313–14 (3d Cir. 2019) (finding that failure to read an arbitration agreement does not relieve a consumer from the obligation to arbitrate); *Zabokritsky v. JetSmarter, Inc.*, No. 19-cv-273, 2019 WL 2563738, \*3 (E.D. Pa. June 20, 2019) (enforcing a clickwrap agreement even though the user did not read the hyperlinked agreement because she slid a button next to a statement indicating her agreement to the hyperlinked terms).

By contrast, "[i]n browsewrap agreements, a company's terms and conditions are generally posted on a website via hyperlink," typically at the bottom of a website or on a certain page of the website, and the user can continue to use the site without any knowledge of the terms' existence. [2] *James v. Glob. TelLink Corp.*, 852 F.3d 262, 267 (3d Cir. 2017); *see Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014). These agreements are not commonly enforced by courts unless a user can be charged with "constructive notice" that continued use of the website will constitute acceptance of the agreement. *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 331–34 (W.D. Pa. 2020) (enforcing a browsewrap agreement because the hyperlink to the site's terms appeared on the log-in page). Constructive notice is found when "the terms are

---

[2] The Pennsylvania Superior Court also recognizes two other types of agreements: "'Scrollwrap' requires users to physically scroll through an internet agreement and click on a separate 'I agree' button in order to assent to the terms and conditions of the host website. 'Sign-in wrap' couples assent to the terms of a website with signing up for the use of the site's services." *Duffy*, 354 A.3d at 24 (quoting *Sarchi v. Uber Techs., Inc.*, 268 A.3d 258, 266 (Me. 2022)).

reasonably conspicuous on the webpage" so that a reasonably prudent user would be inclined to notice them. *Id.* at 331 (quoting *James*, 852 F.3d at 267).

While these labels can be useful to a court's analysis of mutual assent, they are not necessary to finding that mutual assent exists. *See Kirkham v. TaxAct Inc.*, No. 24-cv-1515, 2025 WL 914307, at *4 (3d Cir. Mar. 26, 2025) (declining to characterize an agreement where the user created an online account and checked a box indicating agreement to the hyperlinked terms as either "clickwrap" or "browsewrap" because the court found mutual assent either way). Outside of labels, reasonably conspicuous notice can be analyzed by looking at the context of the transaction and the visual aspects of the purchase page. *Checchia*, 771 F. Supp. 3d at 608–11. Courts have generally found that terms in blue, underlined, and hyperlinked font, which stand out from otherwise black text, on the main portion of the webpage, are likely to be reasonably conspicuous to the reasonably prudent user. *Id.*; *Berman*, 30 F.4th at 856–57; *see also Kirkham*, 2025 WL 914307, at *4–5.

Here, the Court finds that Byte's Informed Consent most resembles a clickwrap agreement because it presented Plaintiff with terms and conditions via a hyperlink on the purchase page and required her to acknowledge the terms by clicking a checkbox in order to proceed with each of her three purchases. *See* ECF No. 13-2 at 2; *Duffy*, 354 A.3d at 24. The box that Plaintiff checked next to the statement containing the hyperlink to the Informed Consent is reproduced below:

I agree to Byte's Privacy Policy, Terms of Use, and Informed Consent.

ECF No. 13-1 at 10.

On Byte's purchase page, where Plaintiff made three separate purchases over the span of eight months, the hyperlinked Informed Consent appeared in blue, underlined font, set apart from

the surrounding black text, next to the "I agree" checkbox. *Id.* Within the thirteen-page Informed Consent document, the Arbitration Agreement appears first towards the bottom of page eight. ECF No. 13-2 at 12. The words "**Agreement to Arbitrate and Class Action Waiver**" on page eight are bolded and set apart from other text, similar to all other section headings in the document. *See id.* This section defines "arbitration" as meaning "submission to arbitration pursuant to the attached Agreement To Arbitrate and Class Action Waiver, and not by a lawsuit led in any court, except individual claims within the jurisdiction of Small Claims Court." *Id.* at 12–13. The Arbitration Agreement section is positioned right above the section titled "Exchanges and Returns," which is a section that a reasonably prudent purchaser would likely review, especially when making a major cosmetic, and potentially expensive, purchase for dental aligners. *See id.* at 13.

Further, on page ten of the thirteen-page document, the words "**AGREEMENT TO ARBITRATE AND CLASS ACTION WAIVER**" appear again towards the top of the page in large, bold, and capitalized text that clearly set it apart from every other heading in the document. *Id.* at 14. Within this section, the agreement states in the third paragraph: "You acknowledge and agree that you and Byte et al. are each waiving the right to a trial by jury[.]" *Id.* The rest of page ten and the entirety of pages eleven and twelve describe at length the arbitration rules, process, location, procedure, and fees. *Id.* at 14–16.

In sum, although Plaintiff was able to complete her purchases without having actually read the waiver of her right to a jury trial, she had inquiry notice of the Arbitration Agreement because the hyperlinked Informed Consent clearly demarcates the Arbitration Agreement, which was the most prominent section of the Informed Consent document. Therefore, the Court finds that the terms of the Arbitration Agreement were reasonably conspicuous to a reasonably prudent internet user.

10

### 2. *Plaintiff unambiguously manifested assent by checking the box indicating her agreement to the Informed Consent*

Plaintiff does not dispute that she checked the box indicating her agreement to Byte's terms and conditions. ECF No. 17-1 at 2–3. Rather, she argues that simply checking the box is not enough to manifest her intent to be bound by the terms and conditions. *Id.* at 3, 9. The Court finds that Plaintiff did manifest her assent to enter into the Arbitration Agreement when she checked the box indicating that she agreed to Byte's Informed Consent, which contained the Arbitration Agreement. *See Berman*, 30 F.4th at 857 ("A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement.").

Plaintiff's response to the Motion relies solely on *Chilutti v. Uber Technologies, Inc.*, a 2023 Pennsylvania Superior Court decision that established the following stringent standards for finding unambiguous manifestation of assent:

> [A] stricter burden of proof is necessary to demonstrate a party's unambiguous manifestation of assent to arbitration. This is accomplished by the following: (1) explicitly stating on the registration websites and application screens that a consumer is waiving a right to a jury trial when they agree to the company's "terms and conditions," and the registration process cannot be completed until the consumer is fully informed of that waiver; and (2) when the agreements are available for viewing after a user has clicked on the hyperlink, the waiver should not be hidden in the "terms and conditions" provision but should appear at the top of the first page in bold, capitalized text.

300 A.3d 430, 449–50 (Pa. Super. Ct. 2023) (hereinafter "*Chilutti I*") (en banc), *vacated*, 349 A.3d 826 (Pa. 2026) (hereinafter "*Chilutti II*") (footnote omitted); *see* ECF No. 17-1 at 3–9.

Plaintiff argues that because (1) she did not read the Arbitration Agreement as the site did not require her to do so, and (2) the agreement "[was] not at the top of the first page . . . in capitalized text" but rather "buried on the bottom of page [eight]," she did not manifest assent to the Arbitration Agreement. ECF No. 17-1 at 9. In response, Defendants contend that *Chilutti I* is

11

"no longer good law" because it was vacated by the Pennsylvania Supreme Court. ECF No. 18 at 5. The Court agrees with Defendants because the holding in *Chilutt I* is now vacated, and, in any event, federal district courts are not bound by Pennsylvania Superior Court decisions. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Coviello*, 233 F.3d 710, 713 (3d Cir. 2000) (stating that when the Pennsylvania Supreme Court has not spoken on an issue, federal courts may consider lower state court opinions in conjunction with federal court opinions interpreting Pennsylvania law).

While some Pennsylvania lower courts have continued to apply the strict *Chilutti I* standards post-*Chilutti II*, the *Chilutti I* opinion upon which Plaintiff relies was vacated and quashed on appeal by the Pennsylvania Supreme Court on procedural grounds, *see Chilutti II*, 349 A.3d at 834–35; *see, e.g., Duffy*, 354 A.3d at 19 n.2, 24–25; *Pierce v. Empower Fin. Inc.*, No. 609 WDA 2025, --- A.3d ---, 2026 WL 1192069, at *6 (Pa. Super. Ct. May 1, 2026). Because it was vacated, the holding in *Chilutti I* has no precedential value, despite the Pennsylvania Superior Court opinions that have applied *Chilutti I* this year.[3] The Court therefore declines to apply the strict standards set forth in *Chilutti I* to the instant case.

---

[3] Neither Plaintiff nor Defendants acknowledge in their briefing the recent post-*Chilutti II* Superior Court decisions that have applied the *Chilutti I* standard. *See Duffy*, 354 A.3d at 24; *Pierce* 2026 WL 1192069, at *6. Nevertheless, the Court will briefly address these cases since they are persuasive authority on Pennsylvania law. A close review of the facts of the recent Superior Court cases reveals that the cases are dissimilar to the instant case.

In *Duffy*, the Superior Court applied the *Chilutti I* standards to a hybrid sign-in wrap/clickwrap agreement with a hyperlinked arbitration agreement on a purchase screen where the purchaser clicked on a box indicating assent but never actually clicked on the hyperlink, similar to the scenario here. 354 A.3d at 24. However, in *Duffy*, the court pointed out that the term "arbitration" was not defined in the arbitration agreement and the agreement did not explicitly state that the user was waiving his/her right to a jury trial. *Id.* at 25. Here, the Arbitration Agreement clearly defined the term "arbitration" and explicitly informed users that they were relinquishing their right to a jury trial. ECF No. 13-2 at 14–16.

In *Pierce*, the court applied the *Chilutti I* standards to a browsewrap agreement that required users to register for an account by inputting a six-digit code received in a text message. 2026 WL 1192069, at *1. Directly below the space where users entered the code was the statement, "You agree to our Privacy Policy, Terms, E-Sign, & Subscription Agreement," with hyperlinks to each respective policy. *Id.* The court found that the site did not present a valid arbitration agreement

District courts in the Third Circuit have similarly declined to apply *Chilutti I. See Flynn v. Nat'l R.R. Passenger Corp.*, No. 25-cv-3434, 2026 WL 1252630, at *6 (E.D. Pa. May 7, 2026) (noting that "the decision in *Chilutti [I]* has since been vacated and remanded" and finding the Superior Court's reasoning in *Chilutti I* "unpersuasive"); *Sams v. Nat'l R.R. Passenger Corp.*, No. 25-cv-3015, 2026 WL 1005062, at *1 (E.D. Pa. Apr. 14, 2026) (declining to analyze *Chilutti I* after it was vacated by the Supreme Court and enforcing the arbitration agreement because plaintiff's argument to defeat arbitration relied solely on the prediction that the Pennsylvania Supreme Court would affirm *Chilutti I*).

At any rate, the facts in *Chilutti I* are distinguishable from the facts in the instant case. The *Chilutti I* court found that users registering for accounts with the rideshare app Uber did not "demonstrate [the users'] unambiguous manifestation of assent to arbitration" when agreeing to a "browsewrap" agreement that contained an arbitration clause. *Chilutti I*, 300 A.3d at 449–50. The terms of the agreement were hyperlinked in blue font in the statements, "By clicking 'Create Account,' you agree to Uber's Terms and Conditions," and "By tapping the arrow below, you agree to Uber's Term of Use." *Id.* at 449. Neither plaintiff in *Chilutti I* clicked on or read the terms before completing the registration process. *Id.* at 450. Critically, though, Uber's arbitration agreement did not define the term "arbitration," which the *Chilutti I* court found to be an ambiguous term, as the agreement did not inform users that arbitration involves relinquishing their right to a jury trial. *Id.* The agreement also referred users to a second hyperlink in order to view

_____

because users "lack[ed] an affirmative way to manifest assent," the site "fail[ed] to sufficiently set apart the hyperlink text," and the application screens "did not explicitly state that [the user] would be waiving the right to a jury trial by agreeing to" the terms and conditions. *Id.* at *5, 7. By contrast, here, the checkbox next to the "I agree" phrase represented an affirmative way for users to manifest assent to the Arbitration Agreement, which was set apart from the other sections in the document via large, bolded, capitalized text. ECF No. 13-1 at 10; ECF No. 13-2 at 14. The Arbitration Agreement also explicitly advised users that they were waiving their right to a jury trial. ECF No. 13-2 at 14.

the arbitration rules. *Id*. These facts were crucial to the *Chilutti I* court's holding that the plaintiffs in the case did not manifest assent to arbitrate their claims against Uber. *See id.* at 449–50. By contrast, the Arbitration Agreement here defines the term "arbitration," explicitly warns users that they are waiving their right to a jury trial, and sets out the rules for arbitration proceedings over nearly three pages of text in the thirteen-page Informed Consent document. ECF No. 13-2 at 14–16. Thus, *Chilutti I* is inapposite to the present action on the facts.

Here, Plaintiff concedes that she checked the box indicating her agreement to the Informed Consent, which contained the Arbitration Agreement. ECF No. 17-1 at 2–3. By checking the box next to the statement, "I agree to Byte's Privacy Policy, Terms of Use, and Informed Consent," Plaintiff manifested her assent to the Informed Consent, and consequently, to the Arbitration Agreement. *See, e.g., Checchia*, 771 F. Supp. 3d at 613 (finding that plaintiff "unambiguously manifested assent to SoLo's Terms when he checked the box next to the phrase 'I agree to SoLo's Terms & Conditions'"); *Zabokritsky*, 2019 WL 2563738, at *3 (concluding that plaintiff agreed to arbitrate her claims when she renewed her account "by checking the box to indicate her acceptance of the Membership Agreement"). Thus, the Court finds that the Arbitration Agreement is enforceable against Plaintiff.

### B. The Arbitration Agreement is Sufficiently Broad to Cover Plaintiff's Personal Injury Claims

Plaintiff's personal injury claims fall within the scope of the Arbitration Agreement because it covers "any dispute regarding the products and services offered by Byte and/or affiliated dental professionals, including but not limited to medical malpractice disputes." ECF No. 13-2 at 12. As such, the Court finds that Plaintiff agreed to arbitrate her personal injury claims against Defendants. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("The [Federal] Arbitration Act establishes that, as a matter of federal law, any doubts

concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983))); *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009) ("In determining whether the particular dispute falls within a valid arbitration agreement's scope, there is a presumption of arbitrability[.]" (internal quotations and citation omitted)).

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Stay Action and Compel Arbitration (ECF No. 13). This matter will be stayed pending arbitration.

An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney

**CHAD F. KENNEY, JUDGE**